Argued and submitted January 19, affirmed June 29,
reconsideration denied September 24,
petition for review allowed November 17, 1981 (292 Or 108)

## AMFAC FOODS, INC.,
### dba LAMB-WESTON,
*Respondent,*

*v.*

## INTERNATIONAL SYSTEMS & CONTROLS
## CORPORATION et al,
*Appellants.*

### (No. A7705-06471, CA 16706)

630 P2d 868

Walter J. Cosgrave, Portland, argued the cause for appellants. With him on the briefs was Cosgrave, Kester, Crowe, Gidley & Lagesen, Portland.

Thomas S. Moore, Portland, argued the cause for respondent. With him on the brief were William H. Morrison and Morrison, Dunn, Cohen, Miller & Carney, Portland.

Before Richardson, Presiding Judge, and Thornton, Judge, and Joseph, Chief Judge.*

THORNTON, J.

---

*Joseph, C. J. *vice* Van Hoomissen, J.

## THORNTON, J.

This is an action for damages for alleged breach of a contract to supply and install certain equipment in connection with the construction of a large potato processing plant. The jury returned a verdict for plaintiff. Defendants appeal. We affirm.

Plaintiff is a food processing firm. On the strength of a contract with the McDonald's restaurant chain, a longtime customer, plaintiff decided to build a large plant at Hermiston to process a new potato product. Defendant Flodin, Inc. (Flodin) is an engineering and manufacturing firm specializing in building food processing machinery, which had built machinery for plaintiff's other plants in the past. In 1973 Flodin was acquired by defendant International Systems and Controls, Inc. (ISC), a Texas-based holding company.

On April 29, 1976, plaintiff entered into a contract with an engineering firm named Austin (which is not a party to this action) to build the plant. At the urging of plaintiff, Austin contracted with Flodin, which was to furnish the major portion of the line machinery. A purchase order was accordingly prepared by Austin bearing a date of June 26, 1976. This order was never signed by Flodin, but Flodin commenced work under its terms and received advanced partial payment. On December 7, 1976, a further written agreement was drawn by Austin and Flodin. No new work was required under this order. Flodin had notified Austin that it was short of cash and would be forced to stop production on the machinery if it did not solve its cash flow problems. Owing to its expedited production schedule, plaintiff agreed, and Austin signed the December 7 purchase order. It granted Flodin a $100,000 increase in total price and limited certain aspects of Flodin's liability, which became the basis for several affirmative defenses at trial.

The project experienced numerous delays. Delivery by Flodin was not completed until the second week of January, 1977. The equipment was found to be in unfinished condition upon arrival, and plaintiff claimed substantial damages for repair of defects and consequent delays in

installation of equipment from other vendors. In January, 1977, plaintiff was informed that Flodin was to be liquidated (which was done in December, 1977). There was testimony that Flodin's plant remained in operation until May, 1977, for the purpose of completing two other orders upon which advance payment had been made by the purchaser and which, therefore, could not be cancelled.

The gravamen of plaintiff's complaint was that defendant ISC had interfered substantially with Flodin's performance of the contract and had been a substantial cause of the delay and the alleged defects in the machinery installed at the new plant. Defendant ISC denied the interference and consequent damages and asserted that there was no contractual relationship between plaintiff and ISC and, therefore, ISC was not liable.

Defendants make a total of 13 assignments of error:

1) Denying defendants' motion for directed verdict on the grounds (a) that plaintiff itself had no contract with defendants and (b) that ISC was not liable on the contract of its subsidiary, Flodin.

2) Instructing the jury that ISC could be held liable as a parent corporation if an injustice to plaintiff might otherwise result from ISC's control of its subsidiary;

3) Failing to give an instruction predicating ISC's possible liability upon a specific finding of fraud or dishonesty;

4) Failing to instruct the jury on the significance of the purchase order issued after the original agreement;

5) Failing to instruct the jury on the application of the parol evidence rule (ORS 72.2020);

6) Striking nine of defendants' eleven affirmative defenses;

7) Denying defendants' motion for mistrial based on prejudice resulting from plaintiff's cross examination of the witness Hofker regarding defendant ISC's ties with Iranian oil;

8) Sustaining objections to certain exhibits;

9) Refusing to admit a letter stating that a piece of equipment from another vendor had failed to arrive;

10) Sustaining plaintiff's objection to, and striking witness Hofker's testimony concerning the corporate relationship between Flodin and ISC;

11) Sustaining plaintiff's objection to testimony explaining the meaning of the term "pick it green";

12) Rejecting defendants' offer in evidence of prior complaints filed by plaintiff; and

13) Denying defendants' motion for change of judge.

## PLAINTIFF - AUSTIN AGENCY

Defendants argue that the trial court erred in denying their motion for directed verdict on the basis that plaintiff was not a party to the contract between Flodin and Austin and therefore did not have standing to bring an action on the contract. Plaintiff argued that it had an agency relationship with Austin and, since Austin was acting as its agent in making the contract, plaintiff could properly sue for breach of that contract. Evidence was presented that plaintiff had directed Austin to contract with Flodin; that Flodin was paid by it through Austin; that plaintiff had the right to control execution of the contract; and that plaintiff did not require Austin to pay the costs of Flodin's breach.

■ The standards for finding an agency relationship include the right of the principal to control the agent's dealings and the principal's responsibility to pay for services provided. In *John I. Haas, Inc. v. Tax Com.,* 227 Or 170, 361 P2d 820 (1961), the Supreme Court held that there was an agency relationship between Haas and a corporation buying hops for it, even though the hop buyer was obliged to obtain cover for defects in quality and shortages. The Court found that the buyer paid the growers and was reimbursed by Haas and that Haas had the right to approve all contracts. Similarly in *Sparhawk v. Stevens,* 162 Or 375, 91 P2d 1116 (1939), the Supreme Court found an agency relationship where a carpenter contracted with a home-owner to hire workers and pay them a specific wage,

which was then paid to the carpenter for disbursement to the workers.

Here the fact that Austin was described in the contract as a general contractor is not controlling. The nature of a relationship may be shown by the actions of the parties. Courts may look beyond the language of the contract to determine what the actual relationship was. *Wallowa Valley Stages v. Oregonian* 235 Or 594, 596-97, 386 P2d 430 (1963), *overruled in part on other ground, Woody v. Waibel,* 276 Or 189, 192, n 3, 554 P2d 492 (1976). In the case at bar there was evidence to support either theory - that Austin was a general contractor or agent. Since the trial court was not able as a matter of law to say that there was no agency relationship between Austin and plaintiff, it was proper to submit the question to the jury with instructions on the law.

## PARENT - SUBSIDIARY LIABILITY

ISC moved for a directed verdict on the ground that it was not liable on contracts made by Flodin. The trial court denied defendants' motion and submitted the question to the jury. It is true, as defendants contend, that parent companies are not liable on the contracts of their subsidiaries merely by virtue of owning them. There are, however, at least two situations where the piercing of the corporate veil is allowed and a parent company may be held liable: 1) where the parent company perpetrates a fraud on or causes a severe injustice to another party through control of its subsidiary (the so-called "alter-ego theory"), *Schlecht v. Equitable Builders,* 272 Or 92, 96, 535 P2d 86 (1975); and 2) where the parent directs the business activities of the subsidiary to such a degree that the latter becomes the agent of the parent. *Elvalsons v. Industrial Covers, Inc.,* 269 Or 441, 450, 525 P2d 105 (1974).

In the case at bar, evidence was presented by plaintiff to support its claim that ISC had intentionally ruined Flodin, knowing that it would result in Flodin's being unable to fulfill its contract obligations. Plaintiff maintained that ISC drained Flodin of all its capital, causing the breach, and then attempted to hide behind its corporate shield. Plaintiff also introduced evidence to show

that ISC had taken complete control at Flodin to the extent of replacing its managers with ISC employees. It argues that Flodin became an agent of ISC so that ISC was liable for Flodin's breach of contract. There was sufficient evidence from which a jury could find ISC liable for Flodin's contract under either of these theories, and it was properly instructed on both.

## INSTRUCTIONS ON ISC'S LIABILITY

Defendants argued that the trial court erred in instructing the jury that it could find ISC liable on the Flodin contract if an injustice would otherwise result. A review of the instructions given[1] shows that the jury was properly instructed by the trial court on the law relating to finding a parent corporation liable for the contracts of its subsidiaries. As mentioned, *Schlecht v. Equitable Builders, supra,* 272 Or at 96, permits piercing of the corporate veil if necessary to prevent injustice, assuming an additional showing is made of substantial control by the parent corporation. The trial court's use of the word "injustice" in later instructions was clearly a reference to its earlier instruction on respondeat superior and would not have misled the

---

[1] The Court instructed the jury as follows:

"But, assuming you find that there was an offer and an acceptance, which ripened into a contract, then the next question for you to consider is this: Was Flodin, Incorporated so controlled by ISC, International Systems and Controls Corporation, that Flodin should be considered an agent of ISC in its dealings with plaintiff or with Austin Company or would an injustice result if ISC is not held responsible for Flodin's dealings? That would be the third issue. If you get past the first two, you will have to consider the third one.

"And then, of course, assuming that you would — if you answered that question 'no', if you said Flodin was not an agent of ISC, under the definitions of agency which I will give to you, or if you said, 'No, no injustice will result,' then you would consider the case insofar as ISC is concerned.

"But, if you said 'Yes, Flodin was acting as an agent for ISC,' or that, 'it would result in an injustice' —

"* * * * *

"For example, if you find that Flodin breached its contract and that the plaintiff sustained damage as a result, of course, then you may return a verdict against the defendant Flodin and in favor of the plaintiff. If you would further find that Flodin was acting as an agent for ISC or that ISC should be held liable to the plaintiff so as to prevent an injustice to be perpetrated upon the plaintiff, and that ISC should be held responsible for the acts of Flodin, then you could return your verdict in favor of the plaintiff and against both defendants, ISC and Flodin. Got that?"

jury. Jury instructions must be viewed as a whole and should be considered as the jury might reasonably understand them. *Anderson v. White,* 264 Or 607, 611, 506 P2d 690 (1973).

## JURY INSTRUCTION - PARENT - SUBSIDIARY LIABILITY

■ Defendants requested the following instruction:

"I instruct you that a party which contracts with a subsidiary corporation with knowledge that it is dealing with such subsidiary corporation and is not misled into believing that it is contracting with any other corporation *can look only to the subsidiary* company for any claims in connection with the contract *in the absence of a showing of fraud or dishonesty* on the part of a parent company." (Emphasis supplied.)

The instruction implies that a finding of fraud or dishonesty is a prerequisite to ISC's liability for Flodin's contracts. As previously noted, this is an inaccurate statement of the law, *Elvalson v. Industrial Covers, Inc., supra,* (because a finding of agency between parent and subsidiary will permit the same result), and the trial court correctly refused to give it.

## AUSTIN-FLODIN CONTRACT

■ The trial court instructed the jury on the subject of whether a contract existed between Austin and Flodin as follows:

"But, if you find that Austin was acting as the agent for the plaintiff corporation, then the next question or issue for you to resolve is: Did the purchase order issued by Austin, dated June 26, 1976, constitute an offer and did Flodin's conduct in relation to that purchase order constitute an acceptance of that offer so that a contract resulted between the parties? Now, are you still with me? Okay.
"* * * * *

"If you find that the defendants, or either of them, accepted the offer dated June 26 — I should say, first, you have to find that that the June 26 purchase order was an offer, which was accepted by the defendants or either of them, if you find that acceptance was by undertaking the work on the terms contained in that June 26 purchase order, *then I instruct you, as a matter of law, that the defendants, or either of them, were obligated to furnish to*

*plaintiff the machinery and the equipment listed in the
Austin purchase order dated June 26, 1976, according to
the terms and conditions of that purchase order."* [Emphasis added.]

Defendants objected to this instruction on the
grounds that it was a comment on the evidence and was in
an impermissible hypothetical form. The former ground
alone is pursued on appeal. The basis for defendants' contention is that the instruction alludes solely to the June 26
purchase order, which plaintiff contends was the contract
between the parties, and makes no reference to the December 7 memorandum, which defendants argue either superceded the June 26 purchase order or, since the earlier
document was not signed by Flodin, constituted the parties'
original agreement. The trial court therefore, according to
defendants, singled out the June 26 agreement as more
probative than the December 7 purchase order.

Both parties, in our view, misperceive the substance of the instruction. Plaintiff apparently construes it,
not without justification, as an instruction that the June 26
purchase order "as a matter of law" was the agreement of
the parties, if there was one, not the December 7 contract.[2]
Defendants regard it as a comment on the evidence. Neither side mentions the fact that the court did, in the course
of reviewing the pleadings, alert the jury to each party's
theory as to the operable agreement.[3] Moreover, plaintiff

---

[2] Plaintiff took the position at trial that the December 7 agreement was
invalid as a matter of law because 1) it was signed under duress and 2) there was
no new consideration for it. The duress ground, alleged as an affirmative reply,
was stricken by the trial court at the close of the case. The latter ground was the
basis of one of plaintiff's requested instructions, which was not given. Plaintiff
assigns no error to either action.

[3] The Court instructed:

"And then the defendants admit that, on December 7, 1976, the Austin
Company entered into a purchase order agreement with Flodin for the sale of
certain equipment for said manufacturing facility. The defendants admitted
that but it was never claimed by the plaintiff in its complaint. You recall,
I told you the plaintiff claimed that the contract was made on or about June
26.

"I beg your pardon. The plaintiff did not claim any particular date for the
contract made — what it claimed to be the contract — by Austin Company
with Flodin. Defendants say the contract was made December 7. I hope I
didn't confuse you on that one."

requested a direct instruction on that point, which the trial court declined to give. It is unlikely therefore that the trial judge intended to exclude the December 7 memorandum from the jury's consideration.

The instruction appears to have been directed to the narrow point that an offer may be accepted by performance. The court correctly informed the jury that, if it found Flodin undertook work provided for in the June 26 document, it constituted an acceptance, and all the terms of that agreement became binding on the parties as a matter of law. It may be that specific instructions on the validity and potential supervening effect of the December 7 purchase order would have been proper, but defendants requested no such instruction.[4] The trial court was under no obligation to give instructions not requested by the parties. It follows that the instruction was not a comment on the probative value of the June 26 agreement as compared with the December 7 order. *R.J. Frank Realty, Inc. v. Heuvel,* 284 Or 301, 309, 586 P2d 1123 (1978).

## PAROL EVIDENCE INSTRUCTION

■ Defendants requested an instruction based on the parol evidence rule (ORS 72.2020[5]) which, although it did not mention the December 7 agreement specifically, would have prohibited the jury from considering evidence which

---

[4] The closest defendants came to requesting a specific instruction setting forth their legal theory with regard to the December 7 memorandum was their requested instruction that proof of the June 26 agreement was inadmissible under the parol evidence rule. Refusal to give that instruction is assigned as error and is discussed *infra,* at 10.

[5] ORS 72.2020 provides:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

"(1) By course of dealing or usage of trade as provided in ORS 71.2050 or by course of performance as provided in ORS 72.2080; and

"(2) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

contradicted any terms in that document. Defendants, however, failed to object on this ground to the admission of any evidence offered concerning the June 26 purchase order, the acceptance thereof or the circumstances surrounding the signing of the later agreement. Consequently, there was no basis for the instruction. *See Miller v. Hubbard-Wray,* 52 Or App 897, 630 P2d 880 (1981).

## AFFIRMATIVE DEFENSES

The trial court struck for various reasons all eleven of defendants' affirmative defenses. Defendants claim here that nine were improperly stricken.

a) Real Party in Interest. This defense is disposed of on the grounds stated under the assignment of error regarding plaintiff's agency relationship with Austin.

b) AMFAC - Austin Settlement. Defendants contend that plaintiff is barred from recovery by virtue of having settled its dispute with Austin under their contract. The record shows that the settlement related strictly to the fee Austin would receive under the contract, which had been tied to the success of the project in meeting its completion date. Austin's (and therefore plaintiff's) potential claims against Flodin were not involved in the compromise, even assuming such a settlement might have foreclosed subsequent claims against Flodin.

c) Limitations of Liability in the December 7 Purchase Order. Three of defendants' affirmative defenses were based on provisions in the December 7 purchase order. The first was that plaintiff was limited to $10,000 total damages under the December 7 contract. The only possible basis for this defense in the agreement is the clause limiting to $10,000 the amount for which Flodin would be liable with respect to repairs to correct defects in materials and workmanship. Plaintiff's claim included not only damages for defects in workmanship, but for design defects in certain equipment, delay in delivery, failure to complete all the machinery required by the contract, and return of the additional $100,000 paid under the December agreement. Clearly, the above-mentioned clause is insufficient to limit recovery of these elements of damage and, therefore, there is no basis in evidence for the assertion that Flodin's total

liability could not exceed $10,000. The defense was properly stricken.

■ The second defense in this group alleged that plaintiff's sole remedy for performance defects was to require Flodin to repair it. The contract states:

"In the event the equipment fails to meet performance design criteria, vendor [Flodin] shall take all necessary and required steps to satisfy performance. Vendor shall do so in an expedient manner. All costs, including required removal and reinstallation, shall be borne by the vendor."

This clause falls short of stating that plaintiff's *only* remedy was to require Flodin to fix any design defects. There is no other term that would forbid plaintiff to make the repairs and charge Flodin.

■ The final defense in this group is that Flodin's field engineer did not give prior written authorization for any of the repairs made by plaintiff as required by both the December and June agreements. Plaintiff moved to strike this defense on the ground *inter alia* that there was no evidence to support it. Defendants state in their brief that there was no evidence of such authorization. Defendants assume that the absence of such evidence is sufficient "evidence" to support their allegation and that the defense was therefore improperly stricken. The mere allegation, by way of affirmative defense to a claim for damages, that prior authorization was required before a vendor of goods becomes liable to the purchaser for costs incurred by the latter in repairing the goods is not sufficient to transfer to the purchaser the burden of proving such an authorization was required. That burden remains on the party alleging the matter in avoidance of its liability. Our review of the record indicates that defendants offered no testimony in their case in chief, either through their field engineer or other employe, nor elicited such evidence on cross-examination which affirmatively showed that plaintiff obtained no authorization from Flodin for the repairs. It follows that the defense was properly stricken.

■ d) Estoppel. Defendants argue that plaintiff is estopped to recover against Flodin because Austin made a prior demand for reimbursement for costs of repair. Defendants conceded that no payment had ever been made

on the claim. Without payment, there can be no estoppel because there was no reliance. *Bash v. Fir Grove Cemeteries, Co.,* 282 Or 677, 687, 581 P2d 75 (1978).

■ e) AMFAC - Austin Damage Limitation. Plaintiff's contract with Austin contained a liquidated damages clause fixing a maximum recovery of $10 per day for delays in completion. The agreement is unrelated to the Austin-Flodin contract at issue in this case and there was no attempt by defendants to show that the provision was made for the benefit of third parties with whom the agent may later contract.

f) Estoppel by Virtue of Prior Pleadings. This affirmative defense was properly excluded for the reasons set forth in our discussion of the twelfth assignment of error relating to complaints previously filed, *infra.*

■ g) Failure to Give Notice of Breach. The record reveals as the trial court found, that communications between the parties concerning the delays and defects in the machinery were both numerous and ongoing. There was no substantial evidence to the contrary. This amply justifies the court's conclusion that defendants had actual notice of the alleged breaches.

### IRANIAN OIL REFERENCE.

■ ■ Defendant moved for a mistrial because of the suggestion by plaintiff's counsel that ISC was involved in Iranian oil business. It is true that the United States was particularly antagonistic towards Iran at the time of the trial. However, the trial court is charged with weighing the relevancy of evidence against the prejudice arising therefrom and such decisions will not be overturned except for an abuse of discretion. Defendants had introduced the witness as having special knowledge about ISC's operations. We find no abuse of discretion in admitting the testimony and in refusing a mistrial.

### GANT CHARTS.

■ Defendants offered enlarged copies of two exhibits already in evidence. The exhibits, termed "gant charts," show the planned completion schedule submitted by Austin at the time of its bid in May, 1976, and a subsequent

schedule, showing actual completion dates. Defendants argued that a comparison of the two would show that the project was completed in accordance with Austin's expectations. The trial court ultimately held, however, that testimony the exhibits were intended to elucidate regarding Austin's expectations was irrelevant, inasmuch as both the June 26 and December 7 purchase orders contained specific delivery dates, and the proferred testimony was therefore inadmissible to contradict the terms of the agreement. Defendants have not assigned error to this ruling. It follows that exclusion of the enlargements was proper.

### LETTER RE DELAY IN DELIVERY OF OTHER EQUIPMENT.

■ Defendants objected to exclusion of a letter from one of plaintiff's other suppliers, which reads in part:

"One piece of equipment to be furnished and installed by us is not scheduled to arrive at job site until mid December and that installation would continue into January of 1977, concurrently with start-up of the line by your forces."

The letter in question does not describe the missing piece of equipment, nor does it indicate that its delayed arrival (if it was delayed) in any way affected the completion of the production line. The evidence was too vague to have any probative value. The trial court did not err in excluding it.

### TESTIMONY RE FLODIN'S CORPORATE STATUS.

■ Defendants' witness was allowed to testify as to the operations of Flodin, but not as to its corporate status, which had already been proved by evidence of Flodin's and ISC's corporate records. The testimony therefore would have constituted only cumulative secondary evidence. It was also nonresponsive and contained legal conclusions regarding defendants' corporate interrelationships. The evidence was properly excluded.

### MEANING OF "PICK IT GREEN."

■ One of plaintiff's witnesses, Mr. Key, a former ISC employe who had managed Flodin for ISC, testified that he received a communication from his supervisor at ISC which instructed him (with reference to the Austin contract) to

" 'pick it green' and you will have completed a successful and profitable contract." Key testified:

> "The understanding was pretty clear. We had been so absolutely desperate for cash at that point in time. He meant, take all the cash you can get and do whatever you can do with it to get yourself out of the situation you are in."

Defendants sought to rebut that testimony by offering evidence by a third party (not the sender of the communication) that "pick it green" is a colloquial expression in Texas, where ISC is located, originating in the citrus growing industry, which means that, in order to hit an important delivery date, the product should be shipped even if the finishing touches need to be added after delivery and installation.

Plaintiff objected on the ground that the witness did not send the communication. Defendants would have been entitled to rebut Key's understanding of the term by offering evidence of the sender's intended meaning. Arguably, defendants could also have established that the expression was commonly used in Texas trade parlance. *See* ORS 72.2020(1). The ultimate issue was neither the understanding of Key nor of the sender; rather, the evidence permitted an inference that ISC was concerned with improving Flodin's cash flow, perhaps at the expense of Flodin's customers, which, in turn, is evidence of scienter in plaintiff's attempts to prove fraud or misdealing. Assuming, without deciding, that defendants proferred testimony should have been allowed, we conclude that the error was harmless. There was ample evidence, from Key and others, which bore directly on this point.

## EXCLUSION OF PRIOR PLEADINGS.

The trial court's refusal to admit the first and second amended complaints was within the trial court's discretion. The allegations in those pleadings reflect plaintiff's understanding of the case prior to undertaking discovery and learning more about ISC's relationship with Flodin. The seeming inconsistency, as the trial court found, may well have needlessly confused the jury in what was already a complicated case.

### RECUSAL OF JUDGE.

■ Lastly, as to defendants' motion for recusal of the trial judge, a review of the record does not in our view establish that he displayed prejudice against defendants in this case.

Affirmed.