Argued October 15; affirmed November 26; rehearing denied
December 20, 1946

# EPTON *v.* MOSKEE INVESTMENT CO. ET AL.

(174 P. (2d) 418)

*Will H. Masters,* of Portland, for appellant.

*Harvey S. Benson,* of Portland, for respondents.

Before BELT, Chief Justice, and KELLY, BAILEY, LUSK, BRAND and HAY, Justices.

HAY, J.

Plaintiff brought this suit against Moskee Investment Company, a corporation, and Harry S. Coleman and Fransetta A. Coleman, husband and wife, for specific performance of a contract for the sale of real property.

The complaint alleged that, on January 2, 1945, plaintiff and the defendant corporation (hereinafter called the company) entered into a written contract whereby the company agreed to sell and the plaintiff to purchase certain real property in Multnomah County for the sum of $20,000; that plaintiff paid a required initial installment of $1,000 and ''offered to execute the contract in accordance with the terms and to pay'' a further required installment, but that the company ''refused to execute further contract'', or to accept the further payment, and returned the initial payment; that, on August 17, 1942, the company had conveyed the property to E. H. Greene and Bernice H. Greene, husband and wife; that, on September 16, 1942, said Greenes had executed and delivered to defendant Harry S. Coleman a deed ''in blank'', and, on January 8, 1944, Coleman inserted in such deed the names of himself and his wife as grantees and caused the deed to be recorded; that ''in reality the defendant Moskee Investment Company is the real owner of the said property and has always owned said property and the

purpose of said Harry S. Coleman in placing his name and the name of his wife as grantees in said deed was * * * to avoid the carrying out of the contract between the plaintiff and the defendant Moskee Investment Company.'' A decree was prayed for, declaring that the company was the owner of the property, and requiring it to specifically perform the contract of sale. The defendants answered by general denial. After a hearing, the court found as a fact that the defendant company was not the owner of the property, and dismissed the suit. Plaintiff appeals.

Defendant company is an Oregon corporation, organized August 21, 1934. Its authorized capital stock is $5,000, divided into 5,000 shares of the par value of $1.00 each. The evidence indicates that it was organized by Coleman, as he was the original subscriber for 4,996 of the 5,000 shares. The principal business of the company appears to have been real property management. For a number of years, it had charge of the property involved herein, and, in its own name, rented space in a building thereon to various tenants, of whom plaintiff was one. It collected the rents and gave receipts therefor in its own name.

The evidence for plaintiff may be summarized as follows: He himself testified that, in December, 1944, he negotiated with the company through Miss Helen F. Peterson, who was then in charge of its office, seeking to purchase the property. The negotiations resulted in the acceptance of his offer to purchase at $20,000, on terms. Miss Peterson told him that she had Mr. Coleman's approval of the transaction. Plaintiff paid $1,000 as earnest money and took an earnest-money receipt therefor. He had assumed that the company owned the property, but, on discovering that title there-

to stood in the name of E. H. Greene, he inquired of Miss Peterson, who said she had a deed in blank which would be recorded. Subsequent search showed that the title had been conveyed to Harry S. Coleman, and Miss Peterson assured him that Mr. and Mrs. Coleman would sign a contract of sale. About January 16, 1945, Coleman notified him by telephone, without explanation, that: "We are not going through with this deal." Cross-examined, plaintiff said that Miss Peterson made no question of her authority to sign for the company. He was advised by the company by letter that his offer did not conform to Mr. Greene's instructions.

John P. Carney, a real estate broker, testified that, about September, 1944, he procured from the company an "open listing" on the same property.

Miss Helen F. Peterson testified that she had been in the company's employ since May, 1944. At about Christmas, 1944, she discussed with Mr. Coleman plaintiff's offer to purchase the property for $20,000, which was agreeable with Coleman as far as she knew. She was assistant secretary of the company, but not authorized to sign for it or to buy or sell property. If any sales were made, the papers were to be forwarded to Mr. Coleman for signature. Albert G. Kulp was president of the company. She never met him. Coleman was executive vice-president and gave all instructions. He was not the principal stockholder. Cross-examined, she said that a deed from E. H. Greene and his wife to Harry S. Coleman was in the company's office at the time when the earnest-money receipt was signed. The deed was complete except for the date and the acknowledgment. She herself fixed the date by arbitrarily selecting a date when, as she determined by inquiry of Mrs. Greene, Mr. Greene

had been in Portland. Mr. Coleman informed her that he would not sign the contract because it was not according to the terms that Mr. Greene had outlined. On redirect examination, she said that the notary public who certified to the acknowledgment on the Greenes' deed to Coleman knew the grantors personally, but did not see either of them sign. Greene at that time was in the South Pacific. (During the period covered by plaintiff's negotiations. with the company, both Coleman and Greene were on duty with the armed forces of the United States.)

For the defendants, the only witness called was Mr. William C. Foster. He testified that he was in the company's employ from March, 1940, to May, 1944, at first as property manager and, after Mr. Coleman entered the army, as active manager. The company's business was property management. It owned no real property, but, from time to time, took bare legal title to certain real properties for the purpose of executing mortgages thereon in connection with refinancing. In such cases, it paid no consideration and acquired no actual interest in the properties. Coleman owned most of the properties managed by the company. During the period of Foster's employment, the property involved herein was sold to E. H. Greene. Prior thereto, Coleman had been the beneficial owner. Greene paid a substantial consideration. The property was under mortgage and, sometime after Greene acquired it, the mortgage indebtedness became due. Foster was instructed by both Coleman and Greene to make arrangements to refinance the mortgage, and he did so. The procedure followed was that the Greenes conveyed the property to the company, which thereupon executed a new note and mortgage, and then reconveyed to Greene. This was

done so that Greene would not be liable personally upon the paper. This procedure was a common practice of the company in connection with ''other properties owned by Coleman''. The deed by the Greenes to Coleman, signed by both grantors and bearing Coleman's name as grantee, was left at the company's office either at the time when Green went into the army or when he expected to leave this country. It was not dated or acknowledged. It was still in the files when he left the company's employ. His understanding was that it was left there to facilitate the handling of the property, so that if a sale or other handling became necessary, Mr. Coleman could act for Mr. Greene. Cross-examined, he said that there were about half a dozen stockholders, of whom Coleman was not the principal one. Coleman was executive officer and directed all company transactions. Kulp and Coleman went through college together. Foster never saw Kulp or received instructions from him. The scheme of having the company take title to properties for the purpose of refinancing by executing new mortgages, and thus enabling owners to evade personal responsibility thereon, was ''one of the stock-in-trades that was used by Major Coleman and Mr. Greene in attracting business''. On redirect examination, he stated that it was the custom of the company, in leasing property owned by others but under its management, to execute the leases in its own name irrespective of ownership.

The earnest-money receipt was upon a printed form in common use by real estate brokers. It contained the following proviso: ''It is agreed that if the owner does not approve the above sale, * * * the earnest money herein receipted for shall be refunded. * * *'' In the place provided for the broker's signature appears

the stamped name, "EPTON REALTY & FINANCE CO., BY ..................................". Thereunder, over plaintiff's signature as purchaser, is an agreement to purchase the property and to pay the price of $20,000. Then follows a formal approval and acceptance of the sale, signed "MOSKEE INVESTMENT COMPANY BY Helen F. Peterson."

Plaintiff contends that the evidence justifies a conclusion that the company was created or used as a mere convenience for the management of Coleman's property; that it was wholly dominated by Coleman; and that, under the circumstances, the court should have looked through the corporation to Coleman as the real party in interest.

In this connection, plaintiff maintains that the stock-book shows that the ownership of the stock was juggled about and that more stock was issued than was authorized. The stock-book was indeed carelessly kept, but our examination of it satisfies us that it shows stock ownership as follows: Albert G. Kulp, 2,000 shares; Mildred C. Carlton, 2,000 shares; Harry S. Coleman, 996 shares; and Elbert H. Greene, Wallace E. Frazier and Paul F. Murphy, one share each.

Deeds which are in evidence show how the property was handled. It was purchased by Mr. Coleman on December 10, 1936, and, on November 1, 1937, he conveyed it to the company by a deed which bore no revenue stamps. On December 15, 1941, the company conveyed it to Elbert H. Greene by a deed bearing revenue stamps in the sum of $1.65. This conveyance was made subject to an outstanding mortgage indebtedness of $13,000. (Greene at that time owned one share of stock and was secretary of the company.) On March 16, 1942, Greene conveyed the property to the company. The deed bears no revenue stamps.

On August 12, 1942, the company executed a mortgage upon the property for $12,000, and, on August 17, 1942, reconveyed it to Greene by a deed bearing no revenue stamps. Thereafter Mr. Greene, having entered the army and being about to be sent to the South Pacific war theatre, signed the deed to Coleman under the circumstances and for the purposes indicated by the testimony heretofore recited.

■■ It is well settled that, when corporate entity is used to accomplish fraud or injustice, the courts will disregard it, and will look through the corporate form to the real actor or actors in the transaction. 18 C. J. S., Corporations, section 7b; Anderson, Limitations of Corporate Entity, sections 21, 23, 48; *Security Sav. & Trust Co. v. Portland Flouring Mills Co.*, 124 Or. 276, 288, 261 P. 432; *Murray v. Wiley,* 169 Or. 381, 399, 127 P. (2d) 112, 129 P. (2d) 66; Anno., 1 A. L. R. 610, 613; 34 A. L. R. 597, 600. This rule is applicable whether the stock is owned by one person or by many, or by another corporation. *Security Sav. & Trust Co. v. Portland Flouring Mills Co.*, supra; Ballantine, Separate Entity of Corporations, 60 Am. Law Rev. 29.

■ The defendants say, however, that the complaint failed to state facts sufficient to raise an issue justifying a disregard of the corporate entity. However that may be, we think that, under the evidence, the question is not before us. The gravamen of the complaint was that the company was the real owner of the property, and that Coleman caused his name, as grantee, to be inserted in the Greene deed to avoid the obligations of the contract between the company and plaintiff. The evidence is clear that Coleman's name as grantee was actually in the deed from Greene

to Coleman at the time when Greene and his wife signed it, or about two years prior to the contract in suit. It indicates, moreover, that the conveyance to Coleman carried the mere naked title to the property, and that the beneficial interest remained in Greene. There was no proof whatever that the company was the real owner. Greene is not a party to the suit. As neither the company nor Coleman was the owner, it would have been futile for the court to have granted specific performance of the contract against either of them. 58 C. J., Specific Performance, section 41; *Adair v. Adair,* 22 Or. 115, 29 P. 193; *Whitney Company, Limited, v. Smith,* 63 Or. 187, 191, 126 P. 1000.

■■ Mr. Coleman was in this country at the time of the hearing, and there is no evidence that he was not available as a witness. Under the law (section 2-407 (6), O. C. L. A.) the production of inferior evidence when higher evidence is available raises a disputable presumption that the higher evidence would be adverse. Plaintiff contends that Coleman "was satisfied to try the case" upon the evidence of Miss Peterson, a present employee of the corporation, (who, by the way, was plaintiff's witness and not Coleman's) and that of Foster, a former employee, whereas his own testimony would have been the higher evidence. He argues, therefore, that Coleman's failure to testify should have influenced the court to have determined the case against him. *Scott v. Astoria Railroad Co.,* 43 Or. 26, 34, 72, P. 594, 62 L. R. A. 543, 99 Am. St. Rep. 710; *Williams v. Commercial National Bank,* 49 Or. 492, 495, 90 P. 1012, 91 P. 443, 11 L. R. A. (N. S.) 857; *Reid v. Wentworth & Irwin,* 155 Or. 265, 274, 63 P. (2d) 210. This argument overlooks the fact that plaintiff, and not Coleman, had the burden of proof. The

foundation of plaintiff's case was the allegation that the company was the real owner of the property. That was what he pleaded. On this appeal, he suggests that, although title was in Coleman, the company was Coleman's alter ego. Under either theory, there was a failure of proof. Assuming, therefore, that Coleman did offer inferior evidence when higher was available, and giving full force to the presumption which plaintiff now invokes, its effect is that it is presumed that, if Coleman had testified, his testimony would have been unfavorable to him. It does not follow that the presumption may be used as affirmative or substantive evidence to make a prima facie case for plaintiff, and such is not the law. 20 Am. Jur., Evidence, section 193; Anno., 70 A. L. R. 1326.

We are of the opinion that the trial judge came to the only decision possible under the pleadings and the evidence. The decree is affirmed, without costs to any party.