Argued February 6, affirmed May 15, 1975

# SCHLECHT ET AL, *Appellants, v.* EQUITABLE BUILDERS, INC. ET AL, *Respondents.*

535 P2d 86

*Joseph F. Ceniceros,* Portland, argued the cause for appellants. On the briefs were Bailey, Doblie, Ceniceros and Bruun.

*Robert E. Stoller,* Portland, argued the cause for respondents. With him on the brief were David W. Harper and Keane, Haessler, Harper, Pearlman and Copeland.

McALLISTER, J.

In August 1971 plaintiffs, who are the trustees of four employee benefit funds, obtained four separate judgments against defendant Equitable Builders, Inc. for unpaid contributions to the benefit funds. Equitable is a wholly-owned subsidiary of the defendant A.E.C.G., dba Gem Building Components, Ltd., a California corporation (hereinafter Gem).[1]

In this suit plaintiffs sought a decree requiring Gem to pay the four judgments obtained by plaintiffs

---

[1] The original Gem Building Components, Ltd., was an Oregon corporation. On February 2, 1971, Gem (Oregon) merged with A.E.C.G., a California corporation, which then changed its name to Gem Building Components, Ltd. It is conceded that if plaintiffs' judgments are debts enforceable against Gem (Oregon) they are also enforceable against the surviving corporation, Gem (California).

against Equitable. The plaintiffs alleged that Equitable was a solvent corporation holding assets sufficient to pay its obligations to the plaintiffs; that Gem had control of the corporate actions and activities of Equitable and dictated Equitable's policies to the extent that the mind and will of Equitable was not independent of, but was identical to, the mind and will of Gem. Plaintiffs further alleged that Gem caused Equitable to convey to Gem assets belonging to Equitable wholly without consideration and that on December 31, 1970 Gem acquired all the assets and liabilities of Equitable and thereafter continued to run the same business enterprise in the same or substantially the same manner.

Plaintiffs further alleged that Gem caused the assets to be transferred from Equitable to Gem with the intent to hinder, delay and defraud the existing and subsequent creditors of Equitable and otherwise disregarded the corporate identity of Equitable. The trial court found for defendants and plaintiffs appeal.

Equitable Builders was incorporated in 1965 as a general contractor which provided labor crews and some materials on construction projects. Michael Drazdorf and Gene Stratton owned all of the Equitable stock and were its principal officers. Gem Building Components, Ltd., was incorporated in 1969 to manufacture the building components installed by Equitable. Stratton and Drazdorf owned eighty per cent of Gem's stock and were its president and treasurer, respectively.

In August or September 1969 Gem borowed $132,000 from the United States National Bank to build a plant in Washington County. Financial statements of both Equitable and Gem were given to the bank and the loan was guaranteed by Stratton and Drazdorf and their wives, as individuals, and by Equitable.

In September 1969 Stratton and Drazdorf exchanged their Equitable stock for stock in Gem and Equitable became a wholly-owned subsidiary of Gem.

In November 1969 the bank made an unsecured loan of $20,000 to Gem and in February 1970 increased the loan to $40,000. The increase was secured by a security agreement conveying all titled vehicles owned by Equitable.

In August 1970 Gem obtained a Small Business Administration loan of $162,000 which was secured by a security agreement covering virtually all assets owned by Gem and Equitable. Both Gem and Equitable signed the SBA note. When the loan was made the bank obtained a list of all the accounts payable by Gem and Equitable and checks in payment of those accounts were drawn on a bank account shared jointly by Gem and Equitable, although each company kept a separate checkbook.

Disbursements were made to satisfy a portion of Equitable's accounts payable, including $45,592 to the Internal Revenue Service, $6,270 to the State Tax Commission, and $30,800 in partial payment of the amount owed to plaintiffs. It is not disputed that at least $82,662 of the SBA loan was paid to Equitable's creditors.

The only evidence indicating the value of Equitable's assets pledged as security for the SBA loan concerned Equitable's titled vehicles, which were valued for insurance purposes at $51,000.

In April 1972 the SBA and the bank foreclosed on the loan and seized all of the assets of Gem and Equitable which had secured the loan. It appears that when the bank and the SBA foreclosed, both Equitable and Gem were insolvent.

Plaintiffs contend that the trial court should have

pierced Equitable's corporate veil and required Gem, as the parent corporation, to pay plaintiffs' judgments against Equitable. Plaintiffs argue that Equitable "was an instrumentality or alter ego of Gem". Plaintiffs further argue that the operations of Gem and Equitable were so intertwined "that there was a de facto merger of the two corporations" sufficient to satisfy the "identity test" for disregarding the corporate entity.

■■ We need not pause to consider the vague distinction between the instrumentality or alter ego test and the identity test for disregarding the corporate entity of a wholly-owned subsidiary. Whichever test is used, it is necessary for the complainant to prove that the conduct of the parent corporation prejudiced the rights of the creditor and resulted in the perpetration of a fraud or injustice. This court has uniformly held that the corporate entity of a subsidiary corporation should be disregarded only to prevent fraud or injustice and to protect persons whose rights have been jeopardized by the conduct of the parent corporation. In *Security S. & T. Co. v. Portland F. M. Co.,* 124 Or 276, 288, 261 P 432 (1928), this court said:

> "It is a general principle that equity will disregard the corporate fiction for the purpose of preventing the successful perpetration of a fraud. * * *"

In *Epton v. Moskee Investment Co. et al,* 180 Or 86, 93, 174 P2d 418 (1946) the court said:

> "It is well settled that, when corporate entity is used *to accomplish fraud or injustice,* the courts will disregard it, and will look through the corporate form to the real actor or actors in the transaction. 18 C.J.S., Corporations, section 7b; Anderson, Limitations of Corporate Entity, sections 21, 23, 48; *Security Sav. & Trust Co. v. Portland Flour-*

*ing Mills Co.,* 124 Or. 276, 288, 261 P. 432; *Murray v. Wiley,* 169 Or. 381, 399, 127 P. (2d) 112, 129 P. (2d) 66; Anno., 1 A.L.R. 610, 613; 34 A.L.R. 597, 600. This rule is applicable whether the stock is owned by one person or by many, or by another corporation. * * *" (Emphasis supplied.)

In *McIver v. Norman,* 187 Or 516, 537-538, 205 P2d 137, 213 P2d 144 (1949), this court said:

"While, for all ordinary purposes, a corporation is regarded as a legal entity separate and distinct from its stockholders, yet, as Judge Sanborn said in *United States v. Milwaukee Refrigerator Transit Co.,* 142 Fed. 247, 'when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.' * * *"

In *Abbot v. Bob's U-Drive et al,* 222 Or 147, 161-162, 352 P2d 598, 81 ALR2d 793 (1960), we said:

"* * * It is well established that where corporate affairs are confused with those of the stockholders, a subsidiary or an affiliate corporation the corporate veil may be lifted to protect persons *whose rights have been jeopardized* by the corporate device. * * *" (Emphasis supplied.)

See, also, *Wakeman v. Paulson,* 257 Or 542, 544, 480 P2d 434 (1971); *Elvalsons v Industrial Covers, Inc.,* 269 Or 441, 525 P2d 105, 110 (1974); 1 Fletcher, Cyclopedia, Corporations 166-168, § 41 (1963 rev vol); Stevens on Corporations 95, § 18 (2d ed 1949); Ballantine on Corporations 292-293, § 122 (rev ed 1946); Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Cal L Rev 12, 19-20 (1925); Powell, Parent and Subsidiary Corporations 6, § 3.

■ Authorities from other jurisdictions agree that some form of moral culpability on the part of the parent corporation is required before the parent will

be held liable for a debt of its subsidiary. Thus in *Marr v. Postal Union Life Ins. Co.,* 40 Cal App 2d 673, 105 P2d 649, 654 (1940), it is stated:

> "* * * Before the courts will disregard the corporate entity of one corporation and treat it as the alter ego of another, even though the latter may own all the stock of the former, it must further appear that there is such a unity of interest and ownership that the individuality of the one corporation and the owner or owners of its stock has ceased, and further, that the observance of the fiction of separate existence would under the circumstances sanction a fraud or promote injustice. In other words, *bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence. * * *"* (Emphasis supplied.)

See, also, *Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 SW2d 336, 340, 38 ALR3d 1093 (Tex 1968); *Bartle v. Home Owners Cooperative,* 309 NY 103, 127 NE2d 832 (1955); *Gledhill v. Fisher & Co.,* 272 Mich 353, 262 NW 371, 102 ALR 1042, 1045 (1935).

■ In this case there is no evidence that the control exercised by Gem over its wholly-owned subsidiary was used to perpetrate a fraud on plaintiffs. While Gem may have caused Equitable to guarantee certain loans there is no evidence that the rights of plaintiffs were jeopardized thereby. In fact, the evidence tends to prove the contrary. The lending by Equitable of its credit to Gem culminated in the negotiation of the SBA loan of $162,000. It is conceded that from the proceeds of that loan at least $82,662 was paid to Equitable's creditors, including $30,800 to plaintiffs. As we have pointed out above, the only evidence about the assets pledged by Equitable as security for the loan concerned Equitable's titled motor vehicles which were valued at $51,000.

There is no evidence that Gem caused Equitable to transfer to Gem any funds or other assets.[2] Counsel for the plaintiffs, with commendable frankness, conceded on oral argument in this court that: "We did not prove that any actions by these corporations specifically prejudiced Equitable—as opposed to trustees against Equitable." Plaintiffs simply did not prove their allegations that Gem "caused the assets to be transferred from Equitable to Gem with the intent to hinder, delay and defraud the existing and subsequent creditors of Equitable."

The decree of the trial court is affirmed.

---

[2] Plaintiffs rely heavily on a financial statement entitled "Equitable Builders Inc., Closing Entry, December 31, 1970", which contains, at the bottom of the page, the following statement: "To transfer asset and liability accounts to Gem Building Components Ltd." The testimony concerning the purpose of that statement was conflicting, but an accountant who examined the books of both Equitable and Gem testified that the purpose of the entry was to prepare a consolidated financial statement for Gem and Equitable as of December 31, 1970.