Argued and submitted March 2, reversed and remanded November 23, 1982

AMFAC FOODS, INC., dba Lamb-Weston,
*Respondent on review,*
*v.*
INTERNATIONAL SYSTEMS & CONTROLS
CORPORATION et al,
*Petitioners on review.*

(CA 16706, SC 28071)

654 P2d 1092

John B. Arnold, Eugene, argued the cause for petitioners
on review. With him on the petition were Johnson, Harrang

& Swanson, Eugene, and V. Thomas Lankford, Jr., and Sharp, Randolph & Green, Washington, D. C. On the briefs were Walter J. Cosgrave, and Cosgrave, Kester, Crowe, Gidley & Lagesen, Portland.

Thomas S. Moore, Portland, argued the cause and filed a petition for respondent on review. With him on the brief were William H. Morrison, and Morrison, Dunn, Cohen, Miller & Carney, Portland.

PETERSON, J.

## PETERSON, J.

Plaintiff Amfac Foods, Inc. (Amfac) brought this action to recover damages it allegedly incurred as a result of defendants' breach of contract. From a jury verdict in plaintiff's favor, defendants appealed. The Court of Appeals affirmed. 52 Or App 907, 630 P2d 868 (1981). This case involves, *inter alia,* the question whether a corporate shareholder, by exercising control over the affairs of a corporation of which it is the sole shareholder, may lose the limitation of liability which corporate shareholders normally enjoy and become liable to creditors of the corporation.

Amfac is a food processing firm which manufactures potato products. In early 1976 Amfac decided to build a large plant in Hermiston to process a new product. Amfac retained an engineering firm named Austin Company (Austin), not a party to this action, to construct and equip the plant. Austin contracted with defendant Flodin, Inc. (Flodin), to fabricate and install the major portion of the line machinery.[1] Flodin, an engineering and manufacturing firm specializing in food processing machinery, had previously built such machinery for Amfac. Since 1973 Flodin had been a wholly-owned subsidiary of defendant International Systems & Controls, Inc. (ISC), a Texas-based holding company.

Following negotiations, a purchase order dated June 26, 1976, was prepared by Austin and sent to Flodin. It specified the machinery needed and set forth the relevant terms. Although Flodin neither signed nor expressly accepted the document as the agreement between the parties, it began to design and fabricate the equipment described in the June 26, 1976, purchase order. There is evidence from which the trier of fact could find that the purchase order of June 26, 1976, was a contract between

---

[1] The contract was between Austin and Flodin. Throughout this proceeding, however, Amfac has contended that Austin was acting merely as its agent when it contracted with Flodin. The defendants controverted this contention. The Amfac-Austin agency issue was eventually submitted to the jury which, in returning a verdict for Amfac, necessarily found that the alleged agency in fact existed. This finding was upheld on appeal, 52 Or App at 912, and defendants have not sought review on this issue.

Flodin and Amfac, through Austin, Amfac's agent. Numerous construction delays occurred, some of which were occasioned by Flodin's failure to perform timely and properly. Eventually Flodin notified Austin that it was having cashflow problems and that it would be forced to stop production of the ordered machinery unless a different agreement was reached. A new purchase order dated December 7, 1976, was prepared by Austin and signed by Flodin, ISC and Austin. The new order gave Flodin $100,000 more than the original purchase order.[2]

Flodin continued to have problems completing its work. Delivery by Flodin was not completed until mid-January 1977. Amfac contends that the machinery arrived in an unfinished and defective condition and that it sustained substantial damages as a result of repairs and delays.

ISC owned all of the outstanding shares of Flodin capital stock. One of the main issues in the case is whether ISC is liable for Flodin's conduct. Amfac asserted two bases for recovery against ISC, Flodin's parent: (1) that Flodin was ISC's agent and ISC is liable under agency principles for Flodin's breach; and (2) that ISC had so substantially interfered with Flodin's management and the performance of Flodin's contractual obligations that ISC should be held liable for Flodin's failure to perform under principles variously denominated "piercing the corporate veil," "alter ego," and the like.

Defendants denied the claim of breach of contract and contested the extent of Amfac's damages. In addition, the defendants claimed that the terms of the December 7 purchase order determined the parties' rights, not the

---

[2] The December purchase order was signed by representatives of Austin and Flodin, and contained this entry on the last page:

"ACKNOWLEDGED BY   C. E. ROEHLER, JR.,   [Signature]

International Systems and Controls Corp"

Comparison of the December and June purchase orders reveals that some equipment listed in the June purchase order was not required under the December purchase order. Conversely, the December purchase order lists a "cross-conveyor" not found in the June contract. The December purchase order also contains a number of terms and conditions not found in the June purchase order.

purchase order of June 26. ISC also denied that it was liable for Flodin's conduct.

## INSTRUCTIONS PHRASED IN TERMS TO PERMIT RECOVERY "IF INJUSTICE WOULD RESULT" SHOULD NOT BE GIVEN

■ The defendants assert that the trial court erred in its instructions relative to ISC's responsibility for the acts of Flodin. The trial court instructed the jury that even if no agency relationship existed between Flodin and ISC, ISC should be held liable "if you find that an injustice would result if ISC was not held responsible for the acts or omissions of Flodin." The trial court so instructed the jury three separate times:

> "* * * An owner of stock, whether it is an individual or if it is another corporation, the owners of stock in a subsidiary corporation or a parent corporation, if it is a subsidiary, it is not liable on the contracts of a subsidiary corporation unless it is proved that the party dealing with the subsidiary was misled as to the actual party with whom it was dealing or if the parent corporation used a subsidiary to perpetrate a fraud or injustice on the other person, or, third, unless you find that the subsidiary corporation was acting as the agent of the parent corporation. * * *

> "Now, it is not necessary that the plaintiff prove any fraud or dishonesty in this case. If the plaintiff proves that the defendant ISC did in fact control the acts of defendant Flodin, and if you find that an injustice would result if ISC was not held responsible for the acts or omissions of Flodin, then you may hold the defendant ISC responsible for the acts of Flodin. * * *.

> "* * * If you would further find that Flodin was acting as an agent for ISC or that ISC should be held liable to the plaintiff so as to prevent an injustice to be perpetrated upon the plaintiff, and that ISC should be held responsible for the acts of Flodin, then you could return your verdict in favor of the plaintiff and against both defendants, ISC and Flodin. Got that?"

Although the trial court's instructions are consistent with the broad brushstrokes of our earlier equity decisions, we

conclude that instructing a jury in such terms was erroneous.[3]

No one can disagree with the abstract proposition that the decisions of courts and juries must be just and fair. Honesty, fairness and justice are terms which describe a morally perfect standard, but an instruction to a jury to "avoid an unjust result" states an imperfect legal standard because each juror, in the end, decides the case by his or her subjective standard of right and wrong. Such a standard, though abstractly perfect, does not permit persons whose conduct is governed by the standard to plan their activities or conduct their affairs with a minimal degree of assurance that what they are doing is lawful. The effect of the court's instructions was to set the jury adrift with virtually no guidance as to the circumstances under which a shareholder may be held liable for a corporate obligation. The determining factor, under the court's instructions, was each juror's subjective feeling as to what is just or unjust. Although the rule under which the jury was instructed is not necessarily inconsistent with our previous decisions, it is an unsatisfactory statement of the law. In this opinion we state a definite rule to be applied in such situations.[4]

## EXCEPTIONS TO SHAREHOLDER IMMUNITY

What, then, is the rule of law which applies in this situation? Because most cases considering this question are in equity and subject to de novo appellate review, courts

---

[3] We have previously stated that instructing juries in the words of appellate opinions is "not advisable," *Ireland v. Mitchell,* 226 Or 286, 294, 359 P2d 894 (1961), and that "care and discretion must be exercised" in drawing upon the words of appellate opinions for instructions to juries, *Thornburg v. Port of Portland,* 244 Or 69, 73, 415 P2d 750 (1966). Many of our previous opinions in this area of the law were written with no view that juries would be involved in the decisionmaking process in such cases.

[4] The plaintiff contends that the trial court's use of the word "injustice" in the court's instructions was invited by the defendants, because they requested an instruction reading as follows:

"The owners of the stock of a subsidiary corporation are not liable on the contracts of a subsidiary unless it is proved that the party dealing with the subsidiary was misled or used the subsidiary to perpetrate a fraud or injustice."

Were this the only claim of error, we would be reluctant to reverse because the instruction which was requested by the defendants contains language which is similar to the instruction given by the trial judge. As will be seen below, however, other errors require reversal of this case.

have not articulated rules with the specificity typical of rules applied in actions at law. Analysis of our decisions, of opinions of other courts and of the writings of commentators leads to the conclusion that understandable legal rules relative to this theory of recovery can be articulated so as to achieve a degree of predictability in both law and equity cases.

This case presents a variant of a recurrent problem—viz., a corporation, alleged to be liable to a plaintiff, happens to be judgment-proof or nearly so, and the plaintiff seeks to have its claim satisfied out of the assets of a shareholder.

The question of when and under what circumstances a shareholder becomes liable for a corporate obligation has troubled judges and lawyers for a century or so. Although corporate shareholders were not insulated from liability for debts of the corporation in common law England,[5] shareholder insulation from such liability has been a cornerstone of corporate law in the United States since the nineteenth century. Virtually every state has a statute similar to ORS 57.131(1), which limits a shareholder's liability to the cost of the shares held.[6]

Limited shareholder liability was extended to corporate shareholders to encourage risk capital investments. In 1929 then Professor William O. Douglas wrote:

"* * * [N]o one would claim that the availability of limited liability played an insignificant part in the expansion of industry and in the growth of trade and commerce. It has had a potent influence. Limited liability is now accepted in theory and in practice. It is ingrained in our

---

[5] *Salmon v. Hamborough,* 1 Ch Cases 204 (Ch Ct 1671). *See* M. Dodd, *The Evolution of Limited Liability in American Industry: Massachusetts,* 61 Harv L Rev 1351, 1351 n 1 (1948).

[6] ORS 57.131(1) provides:

"(1) A holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay to the corporation the full consideration for which such shares were issued or to be issued."

Flodin is a Delaware corporation doing business in Washington and Oregon. ISC is a Delaware corporation with its headquarters in Texas. Amfac is a Delaware corporation doing business in Oregon as Lamb-Weston. No party has suggested that there are any choice of law questions in this case.

economic and legal systems. The social and economic order is arranged accordingly. Our philosophy accepts it. It is legitimate for a man or group of men to stake only a part of their fortune on an enterprise. Legislatures, courts and business usage have made it so. Each has taken the extreme but logical step of allowing *one* man to do what one thousand men may do. * * *." (Emphasis in original.)[7]

The corporate form was not intended to be a device by which persons could engage in business without obligation or risk. The privilege of limited liability of the shareholders of a business corporation carries with it the obligation to conduct business as a corporation, and abuse of the privilege may create personal liability for the act of the corporation. F. Powell, Parent and Subsidiary Corporations 2 (1931).

It soon became apparent that the benefits of limited shareholder liability could lead to corporate abuses. The turn of the century saw the rise of numerous claims against corporate shareholders by creditors of insolvent corporations. A body of common law was created, denying shareholder limited liability when the corporation was being used for an improper purpose.[8] Unfortunately, many judicial opinions contain alluring but largely unhelpful rhetorical

---

[7] Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations,* 39 Yale L J 193, 193-94 (1929).

"Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott,* 321 US 349, 362, 64 S Ct 531, 88 L Ed 793 (1943) (Douglas, J.).

[8] As early as 1896 this court upheld a decree setting aside a sale of goods to a corporation, saying:

"* * * [T]he effect of the allegations is that Minott was the corporation and the corporation was Minott, and that it was organized and used by him as a means of hindering and delaying his creditors. Under such circumstances a court of equity will look through and beyond the legal forms in which the transaction was clothed, and, if its real object and purpose was to hinder and delay creditors, will declare the sale and transfer void as to them, and no rule of law which regards a corporation as an artificial person, separate and independent of its shareholders, can stand in the way of such a result. * * *" *Bennett v. Minott,* 28 Or 339, 347, 44 P 288, 290 (1896).

*Bennett v. Minott* was a creditor's bill suit to set aside a conveyance made for the purpose of hindering creditors. A suit to set aside a fraudulent conveyance presents an independent theory of recovery which differs from the plaintiff's theory in this case.

devices which purport to state a rule, but generally state merely a result.[9]

■ ■   The analysis must begin with the statutory premise of ORS 57.131 that shareholders, as shareholders, enjoy immunity from claims of creditors of the corporation in excess of the full consideration for which their shares were issued or to be issued. Limited liability is the rule. We are concerned with defining the exception.[10] It must be remembered that this exception exists as a potential basis for a claim in addition to existing theories of recovery which generally will provide a ready, practical form of relief to an injured corporate creditor. Where the corporation's liability to the plaintiff is incurred while the corporation is acting as agent for the shareholder, the liability of the shareholder, as the principal, is governed by traditional agency and

---

[9]

"* * * [N]o help is to be derived from the multitude of meaningless, though undeniably picturesque, epithets which have been applied to corporations whenever the court has felt, often inarticulately, that the corporate device was being used in ways or circumstances which the court did not sanction. Whatever failure there has been in recognizing the specific issue presented in various types of cases involving parent and subsidiary corporation or in giving expression to the real factors which made the court do what it did, there has been no lack of emotive epithets synonymous with and as empty as 'instrumentality': adjunct, agent, alter ego, alter idem, arm, blind, branch, buffer, cloak, coat, corporate double, cover, creature, curious reminiscence, delusion, department, dry shell, dummy, fiction, form, formality, mere name, mouthpiece, mere phrase, puppet, screen, sham, snare, subterfuge, tool. The word juggling occasionally goes so far as to state that if facts X, Y, and Z exist the corporation is not a mere 'instrumentality,' but that the existence of those facts will not prevent the corporation from achieving that status if it is but a 'creature' or 'puppet.'" E. Latty, Subsidiaries and Affiliated Corporations 157-58 (1936).

In *Elvalsons v. Industrial Covers, Inc.*, 269 Or 441, 452, 525 P2d 105 (1974), this court wrote:

"The 'alter ego' theory of 'piercing the corporate veil' as a means of preventing fraud or injustice has been criticized for its indefiniteness and because of the absence of objective standards by which the application of that theory can be determined."

[10] *See* F. Powell, Parent and Subsidiary Corporations 6 (1931):

"A refusal to recognize the ordinary immunity of stockholders not only overturns a basic provision of statutory or common law, but is also contrary to a vital economic policy underlying the whole corporate concept. Such a result must therefore be viewed as an extraordinary exception and should be permitted only in cases in which it is necessary in order to promote justice. * * *" *Id.*

respondeat superior principles. In such a case it is not necessary to disregard the separate corporate status to impose liability upon the shareholder for obligations not met by the corporation.[11] In many cases, a fraud form of action will afford relief, making it unnecessary to assert a claim that corporate separateness should be disregarded. Other potentially available theories of recovery include statutory remedies, *see, e.g.,* ORS 57.231, as well as estoppel, quasi contract, creditors' bill, and, finally, the theory that the shareholder, by the shareholder's own conduct, has acted so as to create direct liability as an actor by virtue of the shareholder's own participation in the conduct which gave rise to the creditor's cause of action. *See* Krendl & Krendl, *Piercing the Corporate Veil: Focusing the Inquiry,* 55 Den L J 1, 3-5 (1978). Unfortunately, many opinions reflect a general tendency to use the exception to immunity rubric to describe recovery theories in which, strictly speaking, contract, agency, fraud, or estoppel principles are more appropriate. *See id.* at 2-5.

■      The disregard of a legally established corporate entity is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair the plaintiff's injury. Inasmuch as it is an extraordinary remedy, the doctrine is limited by conditions and limitations which are inapplicable to the other remedies noted above. Accordingly, when a plaintiff seeks to impose liability upon a stockholder of a defaulting

---

[11] This very case illustrates that point. The jury was also instructed that the plaintiff could recover against ISC on an agency theory if they found that Flodin was acting as ISC's agent. *Compare Elvalsons v. Industrial Covers, Inc.,* 269 Or 441, 452, 525 P2d 105 (1974):

"In this case we need not decide whether or not the verdict and judgment may be affirmed on the ground that Industrial Covers was the 'alter ego' of Sargent because there was ample evidence to support a judgment against Sargent on the theory that it was the principle [sic] if not the 'real party in interest'; that Industrial Covers was its agent, if not its 'instrumentality,' and that Sargent also promised and undertook to perform warranty obligations under this contract."

*See also Portland T. & S. Bank v. Lincoln Realty Co.,* 180 Or 96, 116, 170 P2d 568 (1946); 1 W. Fletcher, Cyclopedia on Corporations § 43 (Perm ed 1974 and 1980 Supp at 44); Annot., *Liability of Corporations for Contracts of Subsidiary,* 38 ALR3d 1102, at 1110-19, §§ 2-4 (1971).

corporation, the plaintiff and the court must be careful to keep the theories of recovery scrupulously segregated.[12]

The statements of the exceptions have taken many forms. Courts' opinions often described results more than rules, saying that the shareholder would be held liable "to prevent injustice," "to prevent fraud," to prevent "evasion of just responsibility," to prevent the "distortion or hiding of the truth," to prevent a public wrong, to protect the rights of innocent parties where recognition of corporate separateness would result in "a manifest absurdity," or to prevent the avoidance of a legal obligation or duty. *See United States v. Milwaukee Refrigerator Transit Co.*, 142 F 247, 255 (Cir Ct E D Wis 1905); *Boston & M.R.R. v. Peterborough R.R.*, 86 NH 217, 166 A 275 (1933); *Commonwealth v. Bonetti*, 211 Pa Super 161, 235 A2d 447 (1967); 1 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 41.2 at 180, § 45 (1974).[13]

Some courts and commentators have stated that the shareholder would be liable if the corporation is a mere "instrumentality" of the shareholder. *See United States v. Lehigh Valley R Co.*, 220 US 257, 268, 31 S Ct 387, 55 L Ed 458 (1911); F. Powell, Parent and Subsidiary Corporations 8 (1931). The "instrumentality" theory merely substitutes a label for analysis.

"Slight analysis will convince anyone who attempts to solve a problem of inter-corporate vicarious liability by ascertaining under what circumstances a corporation becomes a 'mere instrumentality' that 'instrumentality' is

---

[12] The pleading should separately set forth each theory of recovery as a separate count. When more than one theory of recovery is pleaded, the trial court's instructions should make clear that the plaintiff is asserting separate theories of recovery, and the instructions, as to each separate theory, should be self-contained. On remand, the plaintiff should file an amended pleading which separately states facts concerning its theory of recovery as to ISC's conduct which results in its loss of shareholder immunity and the damages resulting from that conduct. On trial, depending upon the facts alleged and evidence presented, the trial judge will instruct the jury as to what constitutes improper conduct, and that the jury must also find that the improper conduct resulted in damage to the plaintiff.

[13] For a further list of authors and articles, see W. Cary & M. Eisenberg, Cases and Materials on Corporations 80-103 (1980); Henn, Corporations 205 (1961), E. Latty, Subsidiaries and Affiliated Corporations (1936); F. Powell, Parent and Subsidiary Corporations (1931); Krendl & Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 Den L Rev (1978).

meaningless. The attempt to employ 'instrumentality' as a legal tool is as fruitless as the use of the notion of observing or disregarding the corporate entity, a notion which, significantly, always accompanies language about 'instrumentality.'

"In the first place, passing over the objection that the cases involving the problem of inter-corporate liability invariably cite as 'instrumentality' precedent those cases where no such problem is involved, one soon observes the impossibility of determining from these later cases what an 'instrumentality' is. Nor can one find out what it is from the former cases. And even if one were to discover from the cases involving inter-corporate vicarious liability the elements which go to make up 'instrumentality,' one would then have discovered the factors which remove the insulation which stockholders usually enjoy, and considerable confusion could be avoided by talking directly in terms of those factors without the introduction of an additional term. * * *." E. Latty, Subsidiaries and Affiliated Corporations 157-58 (1936).

■ This court has stated the rule that under some circumstances corporate shareholders who control and dominate a corporation may be held personally liable if the corporation is a mere "instrumentality" or "alter ego" and where fraud or injustice has resulted. These statements from *Schlecht v. Equitable Builders*, 272 Or 92, 535 P2d 86 (1975), summarize some of our prior holdings:

"We need not pause to consider the vague distinction between the instrumentality or alter ego test and the identity test for disregarding the corporate entity of a wholly-owned subsidiary. Whichever test is used, it is necessary for the complainant to prove that the conduct of the parent corporation prejudiced the rights of the creditor and resulted in the perpetration of a fraud or injustice. This court has uniformly held that the corporate entity of a subsidiary corporation should be disregarded only to prevent fraud or injustice and to protect persons whose rights have been jeopardized by the conduct of the parent corporation. In *Security S. & T. Co. v. Portland F. M. Co.*, 124 Or 276, 288, 261 P 432 (1928), this court said:

" 'It is a general principle that equity will disregard the corporate fiction for the purpose of preventing the successful perpetration of a fraud. * * *'

"In *Epton v. Moskee Investment Co. et al,* 180 Or 86, 93, 174 P2d 418 (1946), the court said:

" 'It is well settled that, when corporate entity is used *to accomplish fraud or injustice,* the courts will disregard it, and will look through the corporate form to the real actor or actors in the transaction. * * * This rule is applicable whether the stock is owned by one person or by many, or by another corporation. * * *' (Emphasis supplied.)

"In *McIver v. Norman,* 187 Or 516, 537-538, 205 P2d 137, 213 P2d 144 (1949), this court said:

" 'While, for all ordinary purposes, a corporation is regarded as a legal entity separate and distinct from its stockholders, yet, as Judge Sanborn said in *United States v. Milwaukee Refrigerator Transit Co.,* 142 Fed. 247, "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." * * *'

"In *Abbot v. Bob's U-Drive et al,* 222 Or 147, 161-162, 352 P2d 598, 81 ALR2d 793 (1960), we said:

" '* * * It is well established that where corporate affairs are confused with those of the stockholders, a subsidiary or an affiliate corporation the corporate veil may be lifted to protect persons *whose rights have been jeopardized* by the corporate device. * * *' " (Emphasis in original; citations omitted.) 272 Or at 96-97.[14]

Analysis of the opinions reveals that in many cases shareholder immunity was upheld even though the defendant was the sole owner of the stock and controlled the day-to-day operations of the company. E. Latty, *supra* at 162. Though control is an element in the formula, we are convinced that if one does not look beyond the element of control (adding "domination" to "control" does not aid the analysis), hopeless confusion will be the result of an inductive effort to derive a legal rule which can be applied to attain predictable results.

---

[14] *See also Wakeman v. Paulson,* 257 Or 542, 544, 480 P2d 434 (1971); *Peet v. Rose City Dodge, Inc.,* 251 Or 68, 69, 444 P2d 478 (1968); *Creditors Protective Asso. v. Balcom,* 248 Or 38, 46, 432 P2d 319 (1967); *Miller Lumber Corp. v. Miller,* 225 Or 427, 433-436, 357 P2d 503 (1961); *A. J. Rose & Son, Inc. v. Board of Funeral Directors and Embalmers,* 31 Or App 537, 542, 570 P2d 1008 (1977); *State ex rel Grabhorn v. Grabhorn,* 28 Or App 357, 360, 559 P2d 923 (1977); *Palm Gardens, Inc. v. OLCC,* 15 Or App 20, 26-27, 514 P2d 888 (1973); Annot., *Liability of Corporation for Contracts of Subsidiary,* 38 ALR3d 1102 (1971).

■ Ownership of all the stock of the corporation by one person, in and of itself, is insufficient to breach the wall of immunity created by ORS 57.131(1). Nor is the control of the corporation by a shareholder, in and of itself, sufficient to support a claim for recovery that the shareholder's immunity should be disregarded. Our recent decision in *Schlecht v. Equitable Builders, supra,* makes that point clear. There, even though an insolvent wholly-owned subsidiary corporation was controlled by the parent corporation, we refused to hold the parent liable for the subsidiary's debt absent some form of moral culpability by the parent. 272 Or at 97-99. We should add that proof of the control actually exercised may, in some cases, suffice to establish an agency relationship. As an exception to the rule of limited liability, the burden of proving shareholder liability under the exception may be more difficult than proving a right to recovery under an agency theory.

■ Where actual exercise of control is shown to exist, improper conduct must also be demonstrated. In *Security S. & T. Co. v. Portland F. M. Co.,* 124 Or 276, 287, 261 P 432 (1928), one Houser owned and "had absolute control" of two corporations. The court refused to "disregard the distinction which exists between a corporation and its stockholder, and to treat Houser as if he were the only party in interest" because there was no evidence of improper conduct on Houser's part. 124 Or at 287-88.

In *Wakeman v. Paulson,* 257 Or 542, 480 P2d 434 (1971), the defendant was president of and owned 98.87 percent of the stock of the B. B. Distributing Co. at the time the plaintiff was hired as sales manager. The corporation became insolvent and the plaintiff sued the defendant, claiming that he should be held liable on a contract between the plaintiff and B. B. Distributing Co. because the defendant controlled the corporation and because he "manipulated the corporation by misrepresentations as to sales so that he could profit by a public stock sale * * *." 257 Or at 546. The defendant had negotiated the contract on behalf of the corporation. Judgment for the plaintiff was reversed. Although the opinion made reference to the "rule" that corporate entity will be disregarded if the entity is used to accomplish fraud or injustice, the court denied recovery saying that "* * * ownership of substantially all of the stock

of a corporation is, of itself, not an adequate basis for disregarding the corporate entity." 257 Or at 544. So far as the claim of wrongful use of the corporation was concerned, the court noted that the misconduct did not affect the plaintiff. 257 Or at 546. The opinion concluded with this comment, "Even if Paulson in effect was the entire management this is not sufficiently strong evidence to disregard the corporate entity." 257 Or at 547.

■ Although *Schlecht v. Equitable Builders, supra,* makes reference to the general rule that the corporate entity will be disregarded "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime," 272 Or at 97 (quoting *United States v. Milwaukee Refrigerator Transit Co.,* 142 F 247, 255 (1905)), the real underpinning of the opinion (and of other opinions of this court) is found in this sentence:

> "* * * [S]ome form of moral culpability on the part of the parent corporation is required before the parent will be held liable for the debt of its subsidiary." 272 Or at 97-98.

Although many, perhaps most, opinions of this and other courts have articulated the exception to the rule of shareholder immunity in terms of the result (using such terms as "to defeat public convenience," "result in the perpetration of a fraud or injustice," "to achieve equity," or "to prevent a public wrong"), a more understandable exception to the rule, with more consistent and predictable results, will obtain if the analysis centers upon the conduct of the shareholder sought to be charged, and the relationship between the improper conduct and the creditor's claim.

■ We state the exception to the rule as follows: When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the

plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff.[15]

■ Conduct which has been held to be "improper" under the foregoing rule has included:

*Inadequate capitalization:* It has been held that gross undercapitalization of the debtor corporation, by itself, may suffice to hold the shareholder liable to a creditor who is unable to collect against the corporation because it was inadequately capitalized. *See Minton v. Cavaney*, 56 Cal 2d 576, 364 P2d 473, 15 Cal Rptr 641 (1961); *Automotriz Del Golfo DeCalifornia v. Resnick*, 47 Cal 2d 792, 306 P2d 1 (1957); Campbell, *Limited Liability for Corporate Shareholders: Myth or Matter-of-fact*, 63 Ky L J 39, 40 (1975); Hamilton, *The Corporate Entity*, 49 Tex L Rev 983, 985-86 (1971); Note, *Inadequate Capitalization As A Basis For Shareholder Liability: The California Approach and A Recommendation*, 45 S Cal L Rev 825 (1972).

*Milking:* Shareholders have been held liable for a corporation's debt because they have milked a corporation by payment of excessive dividends, *Burton v. Roos*, 20 F Supp 75 (WD Tex 1937), *aff'd sub nom Texas Co. v. Roos*, 93 F2d 380 (5th Cir 1937), by the sale of products to the shareholders at a reduced price, *Rounds & Porter Lumber Co. v. Burns*, 216 Ark 288, 225 SW2d 1 (1949), or by exacting unreasonable management charges, *Taylor v. Standard Gas & Electric Co.*, 306 US 307, 59 S Ct 543, 83 L Ed 669 (1939). *See also Pepper v. Litton*, 308 US 295, 60 S

---

[15] The reported cases reflect an unstated but discernible difference in the treatment of voluntary (contract) and involuntary (tort) creditors. Whether there is a basis for different treatment of a creditor who voluntarily deals with or extends credit to a corporation and one who finds himself with a claim against the corporation which arose without his consent, we need not decide. On this question, *see* W. Cary & M. Eisenberg, *Cases and Materials on Corporations* 100 (1980); E. Latty, *supra* at 201-05; Note, *Inadequate Capitalization as a Basis for Shareholder Liability: The California Approach and a Recommendation*, 45 S Cal L Rev 825, 836 (1972); Comment, *Limited Limited Liability: A Definitive Standard for the Inadequate Capitalization Problem*, 47 Temp L Q 321, 342-44 (1974).

110

Ct 238, 84 L Ed 281 (1939); *Interstate Tel. Co. v. Baltimore & O. Tel. Co.,* 51 F 49 (Cir Ct D Md 1892), *aff'd,* 54 F 50 (4th Cir 1893).[16]

*Misrepresentation, commingling and holding out:* Krendl and Krendl suggest, 55 Den L J at 31-34, *supra,* that misrepresentations which may not be sufficient to constitute fraud would support a recovery against a shareholder on a misrepresentation theory. In some number of cases, shareholders have been held liable for corporate debts because of misrepresentations by the shareholder to the creditor, *Paumier v. Barge B. T. 1073,* 395 F Supp 1019, 1039 (1974) ("This is not an action for common law misrepresentation in which scienter must be proven"), confusion or commingling of assets, *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass 614, 233 NE2d 748 (1968); *Zaist v. Olson,* 154 Conn 563, 227 A2d 552 (1967), or because the respective enterprises were not held out to the public as separate enterprises, *Ross v. Pennsylvania R.R. Co.,* 106 NJL 536, 148 A 741 (1930).[17]

*Violation of Statute:* In a number of cases involving regulations, courts have enjoined conduct of parent corporations which, in order to evade federal or state regulation, were doing business by means of wholly-owned subsidiaries. *See, e.g., Zale Corp & Corrigan-Republic, Inc. v. F.T.C.,* 473 F2d 1317 (5th Cir 1972), *United States v. Ira S. Bushey & Sons, Inc.,* 363 F Supp 110 (DC Vt 1973). In *United States v. Reading Co.,* 253 US 26, 40 S Ct 425, 64 L Ed 760 (1920), a railroad company unsuccessfully attempted to utilize a subsidiary to evade the commodity clause of the Act of June 29, 1906, 34 Stat 584, 585, which made it illegal for a railroad to transport any commodity mined by it. The railroad was held in violation of the statute. *Accord Chicago, M. & St. P. Ry. v. Minn Civic & C Ass'n.,* 247 US 490, 38 S Ct 553, 62 L Ed 1229 (1918); *United States v. Del., Lack., & West R. R.,* 238 US 516, 35 S Ct 873, 59 L Ed 1438 (1915).

█ The foregoing examples are just that, examples. This case is being remanded for a new trial. The plaintiff

---

[16] Insofar as milking is concerned, in many instances readily effective independent theories of recovery may exist, such as a creditor's bill, a derivative suit, or a direct claim against directors. *See* ORS 57.231.

[17] Some of the cited cases would allow recovery on an estoppel theory.

will have the opportunity to plead and prove the specific acts of ISC which are claimed to result in its loss of shareholder immunity. This case was tried on the "injustice" theory referred to above, and the evidence in the record of the specific instances of shareholder misconduct apart from proof of an agency relationship is not notably specific or in detail. Setting forth the precise evidence upon which the plaintiff relied to prove its case against ISC would only add to the length of the opinion and we see no need to do so. We turn then to the causal connection which must be shown.

■ Given improper conduct by the shareholder exercising control over the corporation, the plaintiff must also demonstrate a relationship between the misconduct and the plaintiff's injury.[18] If a shareholder's improper conduct causes no injury to a corporate creditor, there is no basis for a recovery from the shareholder. Consistent with the general policy of shareholder immunity, a shareholder's improper conduct does not give a hunting license to a corporate creditor to redress a general wrong. Surprisingly, this requirement has received little express attention in many of the appellate court opinions. Absence of the causal relationship between the misconduct and the creditor's claim has, however, been the basis for the denial of liability in situations where control and improper conduct were shown to exist. In *Wakeman v. Paulson, supra,* there was evidence that the defendant was president of the

---

[18] On the requirement that the creditor must show that the improper conduct caused damage to the creditor, see Krendl & Krendl, *Piercing the Corporate Veil: Focusing the Inquiry,* 55 Den L J 1, 21-22 (1978); Comment, *Limited Limited Liability: A Definitive Standard for the Inadequate Capitalization Problem,* 47 Temp L Q 321, 348 (1974).

The rule contained in the text, 294 Or at 108-09, although easily stated, may not be easily applied. The damages which flow from, say, improper capitalization or milking, may or may not be limited to the amount of the shortage of capital or amount milked from the corporation. In some cases the causal relationship will be clear. In others, the causal relationship will be less clear, but still sufficient to create a question for the trier of fact. For example, if the sole effect of a shareholder milking $200,000 from a corporation is to reduce the amount available for creditors, the shareholder's liability to corporate creditors would be limited to $200,000. On these and related questions, *see* Landers, *A Unified Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy,* 42 U Chi L Rev 589, 606 (1975); Posner, *The Rights of Creditors of Affiliated Corporations,* 43 U Chi L Rev 499 (1976).

corporation and owned a majority of its stock. In denying recovery for lack of a relationship between alleged misconduct and the plaintiff's damage, this court held:

> "Plaintiff's primary argument is that Paulson manipulated the corporation by misrepresentations as to sales so that he would profit by a public stock sale and a subsequent sale of assets to another corporation. Such a charge, if proved, and we do not intimate it was or was not proved, is not dispositive. The wrongful use of the corporation which causes the corporate entity to be disregarded must be conduct affecting the right of the party attempting to disregard the corporation and hold the individual." 257 Or at 546.

*Schlecht v. Equitable Builders, supra,* reached the same result. Although there was evidence that the parent might have caused the subsidiary to guarantee certain loans, the court denied recovery because of the absence of a causal relationship, saying that "* * * there is no evidence that the rights of plaintiffs were jeopardized thereby." 272 Or at 98. On remand, if there is evidence of conduct by ISC which, if believed by the jury, gives rise to a right of recovery against ISC, the jury should be instructed that the plaintiff can recover those damages which resulted from the improper conduct. We turn then to some of the other issues in the case.

## DISCUSSION OF OTHER ASSIGNMENTS OF ERROR

The evidence shows, without substantial dispute, that Flodin undertook the design and fabrication of the equipment described in a purchase order dated June 26, 1976, even though it never signed the purchase order. Problems arose later in 1976, leading to negotiations between Flodin and Austin. On December 6, 1976, a new purchase order was signed containing terms and conditions which were substantially different from those contained in the purchase order of June 26, 1976. On December 9, 1976, Austin wrote Amfac, saying:

> "As explained in our meeting in your office with your management on December 2, 1976, we have been negotiating with Flodin Inc. for several months on suppling [sic] the Raw Preparation and Patty Production equipment for subject Project.

> "With your concurrence we continued these negotiations [sic] with Flodin Inc. in our Northwest District office on

December 6, 1976, and in line with your telephone conversation with our Mr. Ray Rowan, concluded the contract negotiations on December 7, 1976 in the total contract amount of $620,479.00. A copy of the contract is enclosed for your file."

The trial court instructed the jury:

"If you find that the defendants, or either of them, accepted the offer dated June 26 — I should say, first, you have to find that that June 26 purchase order was an offer; I am not trying to tell you it was or was not — but, if you find that June 26 purchase order was an offer, which was accepted by the defendants or either of them, if you find that acceptance was by undertaking the work on the terms contained in that June 26 purchase order, then I instruct you, as a matter of law, that the defendants, or either of them, were obligated to furnish to plaintiff the machinery and the equipment listed in the Austin purchase order dated June 26, 1976, according to the terms and conditions of that purchase order."

The effect of the trial court's instruction was to hold, "as a matter of law," that the December 7 contract should be entirely disregarded by the jury, if they found that the June 26 purchase order had been accepted by the defendants. The Court of Appeals, in deciding this issue, stated:

"The instruction appears to have been directed to the narrow point that an offer may be accepted by performance. The court correctly informed the jury that, if it found Flodin undertook work provided for in the June 26 document, it constituted an acceptance, and all the terms of that agreement became binding on the parties as a matter of law. It may be that specific instructions on the validity and potential supervening effect of the December 7 purchase order would have been proper, but defendants requested no such instruction. The trial court was under no obligation to give instructions not requested by the parties. * * *" 52 Or App at 916. (Footnote omitted.)

We disagree. Although the preferable procedure is for a party to submit requested instructions consistent with the party's theory of the case, the failure to request such an instruction does not prevent a party from assigning error to the court's giving erroneous instructions. The instruction given, in effect, told the jury to disregard the December 7,

1976, purchase order if they found that the June 26 offer had been accepted. There was evidence from which the trier of fact could have found that the June 26 agreement, even if accepted, had been modified or replaced by the December 7 purchase order. It was error to give the instruction.

The defendant asserted three affirmative defenses based upon the December 7 agreement. All were stricken by the trial court. Defendants' third affirmative defense was: "That liability of Flodin was limited by its contract with Austin to $10,000.00." This affirmative defense was based upon a provision of the December 7 purchase order which provided:

"The Vendor warrants the equipment herein provided to be free of defects in materials and workmanship for a period of (1) year from date of acceptance of the work, (acceptance as previously defined), provided the design loads and operating limitation have not been exceeded, equipment is serviced and maintained in accordance with the manufacturer's instructions, and not abused or mistreated: Upon notice of any defects, vendor will make the necessary repairs at the owner's plant as installed as soon as possible without regard to time of day, week, or holidays. Vendor's liability pursuant to the above conditions shall be established as a $10,000 limit based upon direct cost. Vendor shall be reimbursed for all costs over $10,000 on a direct cost basis. Costs incurred on warranty expense will be submitted together with attendant time sheets and materials purchase receipts to The Austin Company as they occur.

"All such invoices tendered up to the $10,000 stated liability will be on 'Memorandum Invoices'."

The Court of Appeals held that it was not error to strike this affirmative defense because

"* * * [p]laintiff's claim included not only damages for defects in workmanship, but for design defects in certain equipment, delay in delivery, failure to complete all the machinery required by the contract, and return of the additional $100,000 paid under the December agreement. Clearly, the above-mentioned clause is insufficient to limit recovery of these elements of damage and, therefore, there is no basis in evidence for the assertion that Flodin's total liability could not exceed $10,000. The defense was properly stricken." 52 Or App at 917-18.

This was error. The clause, by its express terms, appears to apply to some of the plaintiff's claims for defective material and workmanship. Although the affirmative defense may not have applied to all of the plaintiff's claims, the trier of fact might have found the limitation of liability applicable to part of the plaintiff's claims, and limited the award on those claims to $10,000. Even though the clause may not have been relevant to claims for (quoting the Court of Appeals opinion) "design defects in certain equipment, delay in delivery, failure to complete all the machinery required by the contract," the clause appears to be otherwise relevant. The affirmative defense should not have been stricken.[19]

One further point requires discussion. On December 8, 1976, the day following the execution of the December 7 purchase order, J. Hilder, an ISC executive in Houston, sent a Telex to T. Key at Flodin, which read:

"1) Congratulations upon your successful negotiations with the Austin Company.

"2) Please extend my congratulations to others involved. Thanks.

"3) Now, 'pick it green' and you will have completed a successful and profitable contract."

Mr. Key, who was no longer employed by ISC at the time of trial, was called by Amfac and testified as follows:

"Q. What was your understanding of the expression, 'pick it green'?

"A. The understanding was pretty clear. We had been so absolutely desperate for cash at that point in time. He meant, take all the cash you can get and do whatever you can do with it to get yourself out of the situation you are in."

---

[19] Technically speaking, the affirmative defense is a partial defense in two respects. The first is that it admits that Flodin could be held liable for up to $10,000.

It is also a defense which is applicable only to claims for defects in material or workmanship. The plaintiff moved to strike the defense "because it does not state facts which would be a legal defense, and also, there is no evidence to sustain it." Plaintiff at no time objected to the defense because it had not been pleaded as a partial defense. *See Pelton v. Gen. Motors Accept. Corp.*, 139 Or 198, 208, 7 P2d 263, 9 P2d 128 (1932). We believe that there was evidence to support the defense.

To counter that testimony, the defendant called a former vice president and counsel to ISC who, before obtaining his law degree, had been a designer, inspector and construction engineer in Texas, and had attended Rensselaer Polytechnic Institute. The witness was asked, "Mr. Hofker, would you tell us whether you are familiar with the expression 'pick it green'?" The trial court refused to permit the witness to explain the meaning of the term "pick it green." The defendants then made the following offer of proof:

"Q.   Mr. Hofker, does the term 'pick it green' have a particular connotation and significance in industry, particularly in the manufacturing and shipbuilding industry?

"A.   Yes, in the contracting industry, it does, yes.

"Q.   All right. Would you tell us what that meaning is?

"A.   Well, it means generally that you, when you are manufacturing something for a particular customer that has a completion date that is important, that you manufacture the goods and you hit that completion date as closely as you can, even if it means — and here is where the term 'pick it green' comes from — even if it means shipping that piece of equipment for final painting or touch up or welding at the customer's place. It means — it refers to picking fruit green so that it will be ready when it gets to the customer. 'Don't worry about having it ready before its leaving the shop.' That's what it means.

"It means ultimately the delivery is the most important thing and it is how it arrives and how it can be completed at the final delivery location, not how it is when it leaves the shop."

The offer of proof tends to show that the term "pick it green" had a specific, somewhat unique meaning in the industry, with which the average juror would not be familiar. The evidence was clearly relevant, both to explain the meaning of a colloquial term having a unique significance in the industry, and to rebut Key's testimony. On remand, the evidence should be received.

The defendants have raised a host of other assignments of error. On remand, most of the other questions raised by the defendants are not likely to recur, and we will not further discuss them in this opinion.

Reversed and remanded to the trial court for a new trial.